**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

RICHARD GITTER,

      Plaintiff,

v.                                       Civil Action No: 3:07CV546

CARDIAC & THORACIC SURGICAL
ASSOCIATES, LTD., et al.,

      Defendants.

## REPORT AND RECOMMENDATION

This matter is before the Court pursuant to 28 U.S.C. § 636(b)(1)(B) for a report and

recommendation on Defendant Cardiac & Thoracic Surgical Associates, Ltd.'s Motion to

Dismiss and Motion for Summary Judgment (Docket No. 41), and Defendant Rockingham

Memorial Hospital's Motion for Summary Judgment (Docket No. 46).  The parties briefed the

matter and the Court held a hearing.  For the reasons discussed below, it is RECOMMENDED

that the Defendant Cardiac & Thoracic Surgical Associates, Ltd.'s ("CTSA") motion be

GRANTED, and that Defendant Rockingham Memorial Hospital's ("RMH") motion be

GRANTED.

## I.  Motion to Dismiss and Summary Judgment Standard of Review

"A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint;

importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the

applicability of defenses." *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th

Cir. 1992).  The Federal Rules of Civil Procedure "require[] only a short and plain statement of

the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of

what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 127 S. Ct. 1955, 1964 (2007) (internal quotations omitted). In this case, the parties have submitted numerous affidavits, deposition excerpts, and other exhibits.  Accordingly, the Court will treat both motions as motions for summary judgment. *Rawlett v. Runyun*, 849 F. Supp. 449, 450 (E.D. Va. 1994); Fed. R. Civ. P. 12(d).

Summary judgment under Rule 56 is appropriate only when the court, viewing the record as a whole, and the reasonable inferences therefrom, in the light most favorable to the nonmoving party, determines that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986).  Whether an inference is reasonable must be considered in conjunction with competing inferences to the contrary. *Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 818 (4th Cir. 1995).  The nonmoving "party is entitled to have 'the credibility of his evidence as forecast assumed.'" *Miller v. Leathers*, 913 F.2d 1085, 1087 (4th Cir. 1990) (en banc) (quotation omitted).

Once a party has properly filed evidence supporting its motion, the nonmoving party may not rest upon mere allegations in the pleadings, but must instead set forth specific facts illustrating genuine issues for trial. *Celotex*, 477 U.S. at 322-24.  Ultimately, the court must adhere to the affirmative obligation to bar factually unsupportable claims from proceeding to trial. *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (*citing Celotex*, 477 U.S. at 323-24).

## II.  Facts

**A.      Search for Candidates**

RMH is an independent, community hospital located in Harrisonburg, Virginia.  In 2005, RMH engaged Charles Franc & Associates ("CFA") to evaluate the feasibility of establishing a cardiac surgery program at RMH.  Early in 2006, Dr. Richard Gitter, submitted his *curriculum vitae* to CFA after speaking with Franc about the opportunity at RMH.  Gitter is a cardiothoracic surgeon who was practicing in Birmingham, Alabama, at that time.

In the summer of 2006, RMH selected CTSA to assist in establishing its new cardiac surgery program, including recruiting and hiring of a surgeon who would be the program's director.  CTSA is a group of cardiothoracic surgeons based in Central Virginia.  RMH and CTSA entered into a written Agreement of General Principles ("RMH/CTSA Agreement of General Principles") on September 8, 2006.  The RMH/CTSA Agreement of General Principles specifies an initial term of two years, divided into three phases: (1) Program Planning; (2) Program Implementation and Operation; and, (3) Program Maintenance.  The RMH/CTSA Agreement of General Principles states, "Surgeon selection will be a joint process, but RMH will have final approval of surgeons recommended by CTSA."  (RMH/CTSA Agreement of General Principles 2.)   Although CTSA and RMH negotiated a written Services Agreement beginning sometime in the Fall of 2006, they never executed the Services Agreement.

Around that same time, CFA forwarded Gitter's *curriculum vitae* to David Grembi at CTSA.  Grembi is the Director of Heart and Vascular Services at RMH.  CTSA decided to pursue another candidate and informed Gitter that it had not selected him.  Dr. Chiwon Hahn, a cardiothoracic surgeon and shareholder at CTSA, advised Gitter that two of the reasons he was

3

not selected were that he would not allow CTSA to call his references or observe him in surgery. Allowing someone to observe him was a prerequisite for employment with CTSA.

In or around late November, CTSA reinitiated their search for candidates because the first candidate withdrew his name from consideration.  Sometime in late November or December of 2006, CTSA contacted Gitter.  Gitter indicated that he was still interested in the position at RMH.  Hahn visited Gitter in Alabama on or around December 6, 2006.  In late January of 2007, CTSA presented Gitter to RMH as a potential candidate.

**B.**      **Negotiations - February 12, 2007, through mid-March 2007**

     **1.**      **Monday, February 12, 2007**

On February 12, 2007, Gitter traveled to Harrisonburg to interview with the RMH surgeon selection committee.  Immediately following the interview, Grembi called Gitter.  Gitter represents that Grembi told him that the RMH selection committee unanimously agreed to offer Gitter the position as surgeon and medical director of RMH's new cardiothoracic program. Gitter also maintains that he did not know that a written agreement would govern the relationship between him, CTSA, and RMH until February 15, 2007.  Gitter asserts that he started the job even though the contracts were not signed.  He believed that the parties agreed about the employment, but not about "how the employment would be governed."  (Gitter Dep. 45:21-46:1.) No one ever told Gitter that he would be working without a written agreement, and Gitter agrees that he eventually knew that the employment would be governed by a written agreement.  Gitter received no compensation from RMH or CTSA between February 12, 2007, and March 30, 2007, when Zocco informed Gitter that CTSA had decided not to hire him.

Grembi states that the committee agreed to recommend Gitter for the position, and that Grembi called Gitter to inform him that the selection team wanted to "move forward with the process." (Grembi Dep. 57:18-19.)  Grembi cannot confirm that he or anyone else offered the position to Gitter at that time.  That evening, Grembi sent an e-mail to Jim Krauss, President of RMH, and Dick Pierce, Vice President of RMH, that stated: "I called Dr. Gitter tonight to tell him our Selection Team unanimously recommended offering him the position . . . . I also told him I would work with [Tiffany Lange, CTSA's Executive Administrator,] to get a contract to him this week if possible."  (Gitter Dep., Ex. 42, RMH-0401.)

Sometime after Grembi's phone call to Gitter, Dr. James Zocco, President of CTSA, attempted to call Gitter to congratulate him.  Sometime during these conversations, Gitter believes that he accepted the offer.  Zocco also states that around this time, Gitter was offered and accepted the position in general terms.

## 2.    <u>Tuesday, February 13, 2007</u>

On the morning of February 13, 2007, Lange sent Gitter a congratulatory e-mail that stated: "I am so pleased that RMH has offered you the position with their facility and thus that you will hopefully be joining our group.  I am going to send a draft employment agreement to you by Thursday afternoon."  (Gitter Dep., Ex. 43, GITTER 000925.)  Gitter responded to this e-mail in the afternoon, thanking Lange: "[W]hat is the verdict on CME[?]" ("Continuing Medical Education").  (Gitter Dep., Ex. 43, GITTER 000925.)  Lange responded that she was still checking on CME and would respond.[1]

---

[1] Subsequently, Gitter "agreed to do CMEs" for "nursing protocols, clinical pathways, operative techniques, and orchestrations of specific procedures."  (Gitter Dep. 40:21-24.)

### 3.     <u>Wednesday, February 14, 2007</u>

On February 14, 2007, Gitter sent an e-mail to Grembi that stated: "I am honored to be a part of RMH and the program . . . . I am eager to begin.  As we discussed, Randy Chang[,] PA-C, would be an asset to our program and I feel his personality would mesh seamlessly with the environment . . . ."  (Gitter Dep., Ex. 60, RMH 00576.)  Chang was Gitter's surgical or physician's assistant in Birmingham.  RMH interviewed Chang sometime in March 2007.  Zocco represents that the interview did not go well and that Chang appeared uninterested in the position.

### 4.     <u>February 15-28, 2007</u>

Beginning on February 15, 2007, the parties exchanged various drafts of the Non-Shareholder Employment Agreement ("Employment Agreement").  Gitter, Gitter's attorney Howard Bogard, Zocco, and CTSA's attorney M. Bruce Stokes had multiple conversations regarding the Employment Agreement.  During this time, the parties negotiated the terms of employment including, but not limited to, a provision that neither party could terminate employment without cause during the first year of employment.

On February 15, 2007, Lange sent an e-mail to Gitter.  The e-mail stated: "Attached is a draft of your employment agreement.  The only thing outstanding is the extra week of vacation . . . .  As soon as you all decide what we will do, I will have the document updated accordingly."  (Pl.'s Mem. Opp'n to CTSA's Mot. to Dismiss/for Summ. J. ("Pl.'s Opp'n to CTSA"), Ex. G, Ex. 2, CTSA0447.)  Attached to this e-mail was a draft of the Employment Agreement.  All pages of this draft contained a legend that read "REVIEW DRAFT FOR DISCUSSION PURPOSES ONLY."  (Pl.'s Opp'n to CTSA, Ex. G, Ex. 2, CTSA0448-0463.)

On February 21, 2007, Grembi sent an e-mail to Gitter, informing him that "we had our cardiac surgery work group meetings and everybody was excited to hear that you have been offered the position." (Grembi Dep. 132:20-24.)

On February 27, 2007, Janelle Jordan, Coordinator of Medical Staff Services at RMH, sent Gitter an application for privileges for Medical Staff membership at RMH. (Def. RMH's Mot. for Summ. J. ("RMH's Mot."), Ex. 1 ("Credentialing App."), RMH CF0015.) Jordan directed Gitter to return the completed application to Valley Health Plan ("VHP"), RMH's Centralized Verification Organization.

**5.     Early March 2007**

Gitter stopped performing cardiac surgeries at Trinity Medical Center in early March of 2007. He explains that he did this because of his conversations with CTSA and RMH, and on the advice of Zocco. However, Gitter continued performing thoracic surgeries at Trinity Medical Center and St. Vincent's East (formerly known as Medical Center East ("MCE")).

**6.     Monday, March 12, 2007**

On March 12, 2007, at Gitter's request, CTSA sent him a draft version of the Services Agreement between CTSA and RMH.

**7.     Tuesday, March 13, 2007**

On March 13, 2007, Gitter sent an e-mail to Lange, expressing his concern with not yet having a finalized contract. Lange responded with an e-mail stating that "it just takes time as each change has to be reviewed and made by our attorney," and assured Gitter that things were moving along as quickly as possible. (Def. CTSA's Mot. to Dismiss & Mot. for Summ. J. ("CTSA's Mot."), Ex. G, Part 2, GITTER 000976.)

8.    **Credentialing Application**

Sometime before March 12, 2007, Lange received Gitter's Credentialing Application. Lange forwarded this application to Jeanette Heatwole, Quality Improvement Coordinator at VHP, on March 12, 2007. Gitter signed the application, and dated some of the pages February 5, 2007. Gitter states that this was a mistake and that he should have dated the application March 5, 2007.

On March 16, 2007, VHP sent a letter to MCE requesting verification of Gitter's staff privileges. VHP received this form back from MCE on March 26, 2007. Barbara Barnette, Manager of Physician Services at MCE, filled out this form. The form indicated that Gitter's privileges at MCE terminated on March 12, 2007. The form further reflected that, at that time, there were no restrictions on Gitter's hospital privileges. MCE recommended Gitter without reservation.[2]

C.    **Final Discussions about the Agreement**

1.    **Friday, March 23, 2007**

On Friday, March 23, 2007, Lange sent Gitter an e-mail indicating that she was ready to send him a "final" copy of the Employment Agreement. (Pl.'s Opp'n to CTSA, Ex. G, Part 2, GITTER 000174-000175.) In this e-mail, Lange addressed Gitter's concerns, clarifying that (1) Gitter would be the primary physician; (2) Gitter would be the Medical Director; and, (3) the agreement would allow for termination without cause after sixteen months, not two years.

---

[2] On May 29, 2007, Barnette submitted a form (Gitter Aff., Ex. A ("Iowa Form")) on behalf of MCE to the Iowa Board of Medical Examiners. This form asked: "Has any disciplinary action been taken against [Gitter]?" and "Is there any derogatory information on file?" (Iowa Form.) Barnette answered "no" to both of these questions. (Iowa Form.)

8

Shortly thereafter, Gitter sent an e-mail reply to Lange indicating that Lange had addressed his concerns and directing Lange to send the final Employment Agreement.

Also on March 23, 2007, Grembi sent Lange an e-mail with a PDF version of "our agreement, including all the Exhibits."  (Pl.'s Opp'n to CTSA, Ex. H, RMH-0053.)  Grembi indicated that Pierce had signed the documents, and that he would also send hard copies to Lange.  In response, Lange told Grembi that she would send everything to Gitter on Monday.

### 2.    Monday, March 26, 2007

On the morning of Monday, March 26, 2007, Lange sent Gitter an e-mail that said she was mailing him, via overnight mail, two copies of the Employment Agreement, two copies of the confidentiality agreement, and the benefits package.  Zocco did not review these documents. At that time, Lange believed there were no remaining issues with the confidentiality agreement, benefits package, and the Employment Agreement.  Lange also states that RMH and CTSA had agreed to the Services Agreement even though CTSA never signed it.

Sometime on March 26, 2007, Lange also mailed a package to Gitter.  The letter that Lange included in the package indicates that the package contained two copies of the Confidentiality Agreement, two copies of the Employment Agreement, and the Benefits Package. Although Gitter received this package on Tuesday, March 27, 2007, he did not execute the Employment Agreement because additional changes were to be made at Bogard's request for Gitter.

Also on the morning of March 26, 2007, Lange sent an e-mail to Grembi.  This e-mail informed Grembi that, due to a death in her family, Lange would not be available from that

afternoon through Thursday, March 29, 2007.  She also informed Grembi that she was sending copies of the contract to Gitter, and a signature page to Grembi.

That afternoon, Bogard sent an e-mail to Stokes detailing five remaining items to be addressed in the agreement.  Specifically, Bogard asked Stokes to: (1) include a statement in the Employment Agreement designating Gitter as the "Primary Physician"; (2) provide Gitter with a copy of the benefits plan; (3) add a provision in the Employment Agreement requiring Gitter to consent to any changes to the Services Agreement that would impact his obligations; (4) provide Gitter a copy of Exhibit B of the Services Agreement that defines Gitter's obligations as Medical Director; and, (5) revise Article X of the Employment Agreement to match the revised language in the Services Agreement regarding the period of time in which neither Gitter nor CTSA could terminate the Employment Agreement without cause.  (CTSA's Mot., Ex. G, Part 2, GITTER 000238.)

### 3.   Wednesday, March 28, 2007

Early on the morning of Wednesday, March 28, 2007, Zocco and Gitter spoke by telephone.  Zocco communicated to Gitter that either they would finalize the agreement that night, or CTSA would pursue a different candidate.  He also told Gitter "to the effect that we had to get this agreement done, that I felt he was . . . jeopardizing the whole process, and I felt the whole thing could fall through . . . and if he [was reluctant,] we needed to move on [and] find another candidate."  (Zocco Dep. 109:2-10.)  Gitter recalls Zocco saying that "the only piece that's missing in this whole puzzle is you and your attorney agreeing to this and then we're done."  (Gitter Dep. 194:4-9.)

Later that morning, Gitter, Bogard, Zocco, and Stokes participated in a conference call to discuss the non-compete provision, moving expenses, bonus and benefits packages, tail insurance, and to confirm that CTSA was hiring Gitter to be the medical director at RMH.  At the end of this conversation, Zocco believed that there was an agreement with Gitter.  Stokes agrees that at the end of the conversation, no issues remained to be resolved.

Stokes made changes to the Employment Agreement and sent a copy to Bogard to review at 3:16 p.m.  At 5:32 p.m. she sent an e-mail asking Bogard to review the "locked version" and instructing Bogard to substitute the March 28, 2007 version of the Employment Agreement for previous versions sent by Lange.  (CTSA's Mot., Ex. G, Part 2, GITTER 000653.)  Stokes instructed Bogard to ask Gitter to execute all documents and "to overnight them to Dr. Zocco. We will review the package and return a fully signed package to Dr. Gitter by overnight mail." (CTSA's Mot., Ex. G, Part 2, GITTER 000653.)  Stokes believed this agreement to be the final agreement between the parties.

Subsequently, the parties began to think that Stokes had not sent "Attachment A," which contained a signature page for Gitter to consent to the Services Agreement.  (CTSA's Mot., Ex. G, Part 2, GITTER 000650-652.)  At 6:05 p.m., Stokes instructed Bogard not to send the Employment Agreement without Attachment A, and that Lange was unavailable to send the document that day.  At 6:16 p.m., Stokes informed Bogard that Zocco wanted Gitter to bring the documents with Gitter to Virginia where RMH would provide Gitter with Attachment A.  At 6:18 p.m, Bogard informed Stokes that Gitter would execute the Employment Agreement and

11

asked how to proceed.[3]  Ultimately, at 7:13 p.m. and 7:16 p.m, Bogard sent e-mails to Stokes

agreeing that Gitter would "hold onto everything until he receives the Attachment A to sign" and

that Bogard would "pass along the information to Dr. Gitter."  (CTSA's Mot., Ex. G, Part 2,

GITTER 000648-49.)

At 8:06 p.m., Gitter sent an e-mail to Bogard stating: "All documents signed.  The exhibit

A was in the packet and was also signed and sent fed ex to Dr Zocco."  (CTSA's Mot., Ex. G,

Part 2, GITTER 000647.)  Also on March 28, 2007, Grembi sent a congratulatory letter on behalf

of RMH to Gitter which had his signature line ((Pl.'s Mem. of Law in Opp'n to Def. RMH's

Mot. for Summ. J. ("Pl.'s Opp'n to RMH"), Ex. E, Ex. 51 ("March 28, 2007 letter")).[4]  The

March 28, 2007 letter states:

> We are very pleased that you have accepted employment with [CTSA]  to
> serve as the primary physician and Medical Director for the cardiac surgery
> program at [RMH] pursuant to your employment agreement with CTSA and the
> services agreement between RMH and CTSA.

---

[3] Several e-mails with contradictory instructions ensued.  At 6:20 p.m., Bogard e-mailed
Stokes and Gitter that Gitter should bring the documents with him to Virginia the next day.
Despite these instructions, Bogard sent an e-mail at 6:41 p.m. to Stokes informing her that
"Dr. Gitter will sign two Agreements and overnight them to Dr. Zocco per your instructions."
(CTSA's Mot., Ex. G, Part 2, GITTER 000652.)  Bogard sent another e-mail to Stokes at
7:03 p.m. stating: "Dr. Gitter will sign the Agreement and overnight.  We can handle the other
signature page once it becomes available."  (CTSA's Mot., Ex. G, Part 2, GITTER 000649.)

[4] Gitter received this letter as an attachment to an e-mail that Grembi sent at 5:51 p.m.
The letter had been circulated internally earlier.  At 4:51 p.m., Glen Hodge, RMH's attorney, had
sent Stokes, via e-mail, a copy of the proposed congratulatory letter.  At 5:10 p.m., Stokes
responded, thanking Hodge for sending this draft.  At 5:20 p.m., Stokes sent another e-mail to
Hodge, stating: "We are fine with the letter as you have drafted it."  (Pl.'s Opp'n to CTSA,
Ex. G, Ex. 47, CTSA1782.)
At 5:51 p.m., Grembi sent an e-mail to Gitter, wherein he stated: "It sounds like the final
issues were resolved today, and that is great news to me!  Please see the attached letter.  We are
looking forward to your arrival in Harrisonburg and implementing the program in a timely
manner."  (Gitter Dep., Ex. 55, GITTER 000860.)

> As you know, RMH has agreed to pay your premium for tail insurance coverage.  Please forward the premium notice to me so that I can see that it is paid.

> Additionally, RMH has agreed to pay your moving expenses to the Harrisonburg area.
> . . . .

> We are looking forward to your signing the agreements tomorrow, and moving forward with the remaining implementation activities.

(March 28, 2007 letter.)  Although Zocco approved this letter, he believes that he should not have given his approval because he had not seen the final language in the Employment Agreement. At the end of Wednesday, Zocco believed that the Employment Agreement was not signed and that "we would get this thing done on Thursday."  (Zocco Dep. 173:16-22.)

### 4.    <u>Thursday, March 29, 2007</u>

On Thursday, March 29, 2007, before Zocco learned that Gitter had signed the agreement, Zocco called Grembi to discuss the Employment Agreement.  At the time, Gitter thought everyone had "finally" agreed "despite some hard feelings."  (Gitter Dep. 178:22-24.) Subsequently, Grembi and Pierce called Gitter, and informed Gitter for the first time that RMH had decided not to hire Chang.  During this conversation, Gitter expressed that he was disturbed because it seemed "pretty obvious" that they waited until after Gitter signed the contract to tell him that they would not hire Chang.  (Gitter Dep. 179:2-10.)  Gitter told Grembi and Pierce that hiring Chang was not "a determining factor," but that the decision not to hire Chang was "starting [the] relationship on a sour note" and that "[i]t's deceitful."  (Gitter Dep. 179:23-180:9.)

Zocco never believed that hiring Chang was a "deal breaker" for Gitter.  (Zocco Dep. 189:1-5.)  Lange represents that hiring Chang was never part of any draft of the Employment

Agreement, that Gitter said he would come "with or without [Chang]."  (Lange Dep. 65:17-20.)
Bogard also states that CTSA's hiring Chang "was important . . . . but it was not a deal breaker."
(Bogard Dep. 110:20-111:1.)

On March 29, 2007, before speaking to Grembi and Pierce, Gitter resigned from Trinity
Hospital in Birmingham and began telling other doctors and friends in Birmingham that he was
moving to Virginia.  Sometime before March 28, 2007, Gitter sold his house in Alabama.

At 5:54 p.m., Gitter sent an e-mail to himself, but the e-mail appears to have been
intended for Grembi.  This e-mail thanked Grembi for the contract letter and asked that Grembi
sign and mail or fax a copy of the letter.  At 7:00 p.m., Gitter forwarded the 5:54 p.m. e-mail to
Grembi with "Contract letter 03-28-07.doc" attached.  (Zocco Dep., Ex. 51, GITTER 000988.)

Zocco believed that Gitter would go to Harrisonburg on March 29, 2007, and that they
would both sign the papers at that time.  Zocco never signed the Employment Agreement because
he did not receive it before RMH decided not to hire Gitter.

**5.**       **Friday, March 30, 2007**

On Friday, March 30, 2007, the members of the RMH selection committee had an early
morning conference call with Zocco and Lange.  During this conference call, the selection
committee decided not to hire Gitter because they were worried that Gitter would not be an easy
person to work with based on the preceding negotiations and the March 29, 2007 phone call.  The
committee decided that Zocco would inform Gitter of the committee's decision.

At 8:29 a.m., before hearing from Zocco, Grembi sent an e-mail to Gitter wherein he
stated that he would send a copy of the contract letter to Gitter.  Grembi also stated: "We look
forward to seeing you next week!"  (Gitter Dep., Ex. 51, GITTER 000988.)

14

At approximately 8:30 a.m., Zocco called Gitter and told him CTSA had decided not to hire him.

### 6.    **Monday, April 2, 2007**

The following Monday, April 2, 2007, Zocco called Gitter and Grembi.  Grembi informed Gitter that RMH independently had decided not to hire him.

### D.    **Past Disciplinary Actions**

On or about February 2006, Gitter joined the staff at MCE in Birmingham as a Courtesy Staff member.[5]  In September 2006, Gitter requested that MCE change his status to Active Staff.

Gitter maintains that sometime in February of 2007, MCE did not provide him with an emergency department call schedule.  He notified MCE that he was not available for emergency department call for certain days of February and March because he would be out of town.[6]  On February 7, 2007, Gitter received a letter from MCE informing him that he was scheduled for emergency department call for February 12 and February 16, two of the days he was scheduled to be out of town.  The letter directed Gitter to respond to MCE by February 9, 2007, regarding these call coverage times.  The letter stated that if Gitter failed to respond, MCE would immediately suspend Gitter's privileges to provide services at MCE.

Thereafter, Gitter tried to change his staff category from Active Staff to Courtesy Staff because MCE does not require Courtesy Staff to take emergency department calls.  MCE denied Gitter's request without affording him a hearing.  Gitter did not arrange for coverage.

---

[5] Gitter confirmed that all statements in his Complaint against St. Vincent's East are factually accurate.

[6] On these days, Gitter was interviewing for the position at RMH in Virginia.

15

On February 12, 2007, MCE suspended all of Gitter's privileges to provide services at MCE because he did not provide MCE with the information it had requested regarding the emergency call coverage by February 9, 2007.  Gitter became aware of this suspension sometime that week before Friday, February 17, 2007.  On February 21, 2007, MCE rescinded Gitter's suspension.  On February 22, 2007, Gitter received a letter from MCE informing him that he was on probation for failing to provide emergency department call during his suspension.  Gitter remained on probation until he resigned from MCE on March 29, 2007.

Gitter maintains that MCE violated its own policies when it suspended him.  Gitter also alleges that MCE acted improperly because it neither notified him that he was under investigation, nor afforded him the opportunity to provide information to the investigating body.  Gitter sued MCE and other defendants in the Circuit Court of Jefferson County, Alabama, on August 31, 2007.  *See* Gitter v. St. Vincent's East, Civil Action No. CV200703047 (Ala. Cir. Ct. filed Aug. 31, 2007).

### III.  Procedural History

On April 5, 2007, Gitter sued CTSA and other fictitious defendants in the Circuit Court of Jefferson County, Alabama.  *See* Gitter v. Cardiac & Thoracic Surgical Assocs., Civil Action No. CV200701272 (Ala. Cir. Ct. filed Apr. 5, 2007).  Gitter amended his complaint on April 17, 2007, adding RMH as a defendant.  *See* 1st Am. Compl.  Defendants, both Virginia corporations, removed the case to the United States District Court for the Northern District of Alabama pursuant to 28 U.S.C. § 1441, 1446, and 1332, on June 1, 2007.  (Defs.' Joint Notice of Removal.)  (Docket No. 26.)

16

On July 2, 2007, with leave of the Northern District of Alabama, Gitter amended his complaint for a second time.  Gitter's Second Amended Complaint alleges: (1) breach of contract; (2) fraud, misrepresentation, and deceit; (3) fraudulent suppression; (4) fraudulent inducement to enter a contract; and (5) conspiracy.  (2d Am. Compl.)  (Docket No. 26, Ex. 19.)

Subsequently, Defendants each filed a motion to dismiss or, alternatively, motion to transfer.  (Docket No. 26, Ex. D, Exs. 5, 6.)  On August 20, 2007, the Northern District of Alabama denied Defendants' motions to dismiss, but granted Defendants' alternative request for transfer to the United States District Court for the Eastern District of Virginia.  Now before the Court are Defendants' motions for summary judgment.

## IV.  Discussion

### A.  Choice of Law

A court exercising diversity jurisdiction applies the substantive law of the forum state. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78-79 (1938); *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  The Court applies Virginia's substantive law to determine what law to apply to Gitter's contract and tort claims.  *Dreher v. Budget Rent-A-Car Sys., Inc.*, 634 S.E.2d 324, 327 (Va. 2006).

#### 1.  Contract Claim

As to Gitter's breach of contract claim, "the law of the place of performance governs the contract."  *Scudder v. Union Nat'l Bank of Chicago*, 91 U.S. 406, 411 (1875).  In Virginia, "[t]he nature, validity and interpretation of contracts are governed by the law of the place where [the contract was] made . . . ."  *C.I.T. Corp. v. Guy*, 195 S.E. 659, 661 (Va. 1938).

17

In this case, the parties negotiated and drafted the Employment Agreement in Virginia. The Employment Agreement contemplated performance in Virginia. The Employment Agreement states: "This Agreement shall be interpreted, construed and governed according to the laws of the Commonwealth of Virginia." Employment Agreement, Art. XX. The parties agree that Virginia law applies. Thus, the Court will apply Virginia law to Gitter's breach of contract claim.

### 2.      Fraud and Conspiracy to Defraud Claims

As to Gitter's fraud and conspiracy to defraud claims, Virginia courts apply the *lex loci delicti* rule, applying the law of the state where the tort occurred. *Dreher*, 634 S.E.2d at 327. The place where a tort occurred is "the place where 'the last event necessary to make an act[or] liable for an alleged tort takes place,' even if the actor has no control over the location of the last event." *Quillen v. Int'l Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir. 1986) (*quoting Miller v. Holiday Inns, Inc.*, 436 F. Supp. 460, 462 (E.D. Va. 1977)). "'When a person sustains loss by fraud, the place of the wrong is where the loss is sustained, not where fraudulent representations are made.'" *Jordan v. Shaw Indus., Inc.*, Nos. 96-2189, 96-2190, 96-2191, 96-2192, 96-2371, 96-2373, 1997 WL 734029, at *3 (4th Cir. Nov. 26, 1997) (*quoting* Restatement (First) Conflicts of Laws § 377 n.4 (1934)). Similarly, in conspiracy to defraud claims, the place of the wrong is where the party relied on the false representation, or where the plaintiff sustained loss. *See Cars Unlimited II, Inc. v. Nat'l Motor Co.*, 472 F. Supp. 2d 740, 750 (E.D. Va. 2007).

It is clear Gitter alleges that he suffered harm in Alabama because that is where he closed his practice, stopped seeing patients, and sold his house. Thus, Alabama law applies.

B.      **Count One:  Breach of Contract**

Under Virginia law, a valid contract requires: (1) an offer, (2) acceptance, and, (3) valuable consideration.  *Montagna v. Holiday Inns, Inc.*, 269 S.E.2d 838, 844 (Va. 1980).  An offer "identifies the bargained for exchange . . . and creates a power of acceptance in the offeree." *Chang v. First Colonial Sav. Bank*, 410 S.E.2d 928, 930-31 (Va. 1991).  An offeree accepts an offer when she or he communicates her or his acceptance to the offeror.  *Power Servs., Inc. v. MCI Constructors, Inc.*, 3 F. App'x 190, 192 (4th Cir. 2001) (No. 00-1358), *available at* 2001 WL 193614, at *2.  Valuable consideration is "a benefit to the party promising or a detriment to the party to whom the promise is made."  *Brewer v. First Nat'l Bank of Danville*, 120 S.E.2d 273, 279 (Va. 1961).

Virginia law defines breach of contract as "'failure, without legal excuse, to perform any promise which forms the whole or part of a contract.'"  *Clevert v. Jeff W. Soden, Inc.*, 400 S.E.2d 181, 183 (Va. 1991) (*quoting* Black's Law Dictionary 188 (6th ed. 1990)).  A breach of contract has three elements: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation."  *Eplus Tech., Inc. v. Nat'l R.R. Passenger Corp.*, 407 F. Supp. 2d 758, 761 (E.D. Va. 2005) (*quoting Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004)).  Gitter must prove that there was a binding contract between him and each Defendant before he can prove that Defendants breached the contract.

### 1.    Alleged Contract with CTSA

The Court will first address Gitter's breach of contract claim as to CTSA.  CTSA argues

that: (1) the parties never formed a contract because CTSA never signed the contract; and, (2) the

Statute of Frauds bars enforcement of any agreement because there is no signed contract.  Gitter

maintains that a contract existed between him and CTSA because he accepted CTSA's offer for

employment on February 12, 2007.  He contends that the employment contract became binding

on March 28, 2007, when he, following CTSA's instructions, executed the employment

agreement and mailed it to Zocco at CTSA.  Gitter argues that CTSA breached the contract when

it terminated his employment.  He also argues that CTSA is estopped from asserting the Statute

of Frauds because he relied on its representation to his detriment and that the Statute of Frauds is

inapplicable because the contract in question could be performed within one year.  The Court

considers first whether the Statute of Frauds applies in this case.

### a.    Applicability of the Statute of Frauds: Performance Within One Year

Section 11-2 of the Virginia Code, the Statute of Frauds, governs when contracts must be

in writing.

> Unless a promise, contract, agreement, representation, assurance, or ratification,
> or some memorandum or note thereof, is in writing and signed by the party to be
> charged or his agent, no action shall be brought in any of the following cases:
> . . . .
> 8.    Upon any agreement that is not to be performed within a year . . . .

Va. Code § 11-2.  "[T]he Statute of Frauds does not require that the complete agreement between

the parties show on the face of the signed writing."  *Am. Indus. Corp. v. First & Merchants Nat'l*

20

*Bank*, 219 S.E.2d 673, 676 (Va. 1975).  However, "[i]f reliance is based upon an unsigned

writing, it must be referred to in a signed writing in clear and distinct terms."  *Id.*

Under Virginia law, a contract that can be performed within one year need not be written.

*Silverman v. Bernot*, 239 S.E.2d 118, 121 (Va. 1977).  This is true even if such performance

requires "some improbable event" such as someone's death.  *Id.*  However, in employment

contracts, the "implied contingency of the employee's death within a year, a circumstance

inherent in every employment contract for personal services, would only have terminated the

contract and would not have performed it."  *Id.* at 122.

CTSA contends that the contract could not be performed within one year because Article

IX of the Employment Agreement sent to Gitter on March 28, 2007, specifically provided that

neither party could terminate the contract without cause during its first sixteen months.  They cite

Gitter's own testimony that the term of the  proposed employment agreement was "16 months,

with options." (Gitter Dep., 80:15-19.)

Gitter argues that the contract could be performed within one year because he could have

died within one year.  Gitter's reliance on the possibility of his own premature death to take the

Employment Agreement out of the Statute of Frauds fails.  If Gitter died within one year, the

contract would be terminated with excuse for future non performance; it would not have

constituted performance itself.  *See* Employment Agreement, Art. IX ("This Agreement shall

immediately terminate upon the death of Employee."); *see also Silverman*, 239 S.E.2d at 121-22.

Moreover, the parties did not premise the duration of the contract in terms of the employer's life.

*Cf. id.* (indicating that while the contract's reference to the death of the employer took it out of

the Statute of Frauds, the court might reach a different result if the contract's duration was not

21

delineated in terms of the life of the employer).  Even reading the facts most favorably to Gitter, the record as a whole plainly shows that the parties contemplated that the Employment Agreement could not be performed within one year, and the Court shall apply Virginia law to requiring a written agreement.  Va. Code § 11-2(8).

### b.        Satisfying the Statute of Frauds - Signed Writing

CTSA did not sign either the Employment Agreement or the Services Agreement.  Gitter contends that the Employment Agreement, nonetheless, is enforceable because the e-mails from Stokes are signed writings sufficient to satisfy the Statute of Frauds.  To satisfy the Statute of Frauds, the e-mails must contain the terms of the alleged agreement.  *See Hewitt v. Hutter*, 406 F. Supp. 976, 980-81 (W.D. Va. 1975) (applying Virginia law to find all essential elements included when a cover letter to the unexecuted written contract was signed by a representative with written authority to do so, and which confirmed terms reached orally); *Am. Indus. Corp.,* 219 S.E.2d at 676 (requiring a signed writing to refer to the agreement in clear and distinct terms).  In addition, Gitter's argument fails unless Stokes had the authority to bind CTSA.  *Fedder Dev. Corp. v. FB Hagerstown, LLC*, 181 F. App'x 384, 387 (No. 05-1689) (4th Cir. 2006), *available at* 2006 WL 1725580, at *3-5.

### i.        Content of the E-mails

Reviewing the e-mails, the Court cannot find that they constitute a writing sufficient to satisfy the Statute of Frauds.  The e-mails do not appear to contain all the essential elements of the contract.  If anything, the e-mails underscore the ongoing discussion of changes within the documents attached to the e-mails, and the confusion between the parties about how to execute the documents.  It is unclear whether Stokes attached the Services Agreement or Attachment A to

the e-mail.  This is relevant given past concerns about the Employment Agreement and the

Services Agreement containing inconsistent terms, *see* Bogard Dep. 183:11-184:23, and the

multiple drafts of the documents that were circulated in the days and weeks before March 28,

2007.

### ii.      Stokes's Authority to Bind CTSA

Even assuming that the e-mails contained the terms of the agreement, CTSA did not

authorize Stokes to sign the Employment Agreement.  In *Fedder Development Corp. v. FB*

*Hagerstown, LLC*, the United States Court of Appeals for the Fourth Circuit considered whether

an e-mail with an unsigned contract attached satisfied the Statute of Frauds.  181 F. App'x at

388-90 (applying Maryland law).  While the court found that an e-mail could satisfy the signature

requirement in the Statute of Frauds, the court found that to be true only if it were signed by

someone with the authority to bind the party.  *Id.* at 387.  The court found that an e-mail sent by

one whose only authority was to deliver the proposed contract could not constitute a signed

writing, and that an indication that the client needed to sign the agreement suggested lack of

authority to make it binding.  *Id.* at 388-89.

On this record, all client communications acknowledged that the clients would endorse

the contract.  The parties understood that Zocco would sign the contract.  In her March 26, 2007

e-mail to Gitter sent at 9:30 a.m., Lange instructed Gitter: "If you would sign both copies of both

agreements and return them to me, I will have Dr. Zocco sign and I will return a fully executed

copy to you for your file."  (Pl.'s Opp'n to RMH, Ex. E, Ex. 17, GITTER 000403.)  In addition,

on March 28, 2007, Gitter sent the copy of the Employment Agreement that he signed to Zocco.

This confirms that Gitter expected Zocco to sign on behalf of CTSA.

The attorneys' communications also confirm that client signatures were necessary. Stokes clearly stated that CTSA would "review the package" before returning "a fully signed package" to Gitter.  (Pl.'s Opp'n to CTSA, Ex. G, Ex. 49, GITTER 000653.)  Bogard admits knowing that CTSA needed to sign the agreements after Gitter executed them, and also confirms he knew that Zocco was the one who was supposed to sign the agreements on behalf of CTSA. Stokes informed, and Bogard knew, that CTSA did not intend to be bound until it had a chance to review the agreements after Gitter signed them.  *Cf. Fedder Dev. Corp.*, 181 F. App'x at 388 (considering an e-mail from the party's attorney that stated his client would not be bound until he signed the final, written document).  Therefore, even if the parties contemplated and agreed to conduct the transaction electronically, Stokes's electronic signature from the e-mails still would have no binding effect because CTSA did not authorize her to sign the Employment Agreement.

### iii.        Intent to Be Bound by the E-mails

Finally, the parties did not intend to be bound by the e-mail discussion.  *See Poly USA, Inc. v. Trex Co., Inc.*, No. Civ.A. 5:05-CV-00031, 2006 WL 517647, at *2 (W.D. Va. Mar. 1, 2006) (considering the "intention of the parties, as objectively manifested" to determine whether the parties intended to be bound by e-mail discussions regarding a settlement agreement) (citation omitted).  Virginia's Uniform Electronic Transactions Act requires parties to agree to conduct a transaction by electronic means for an electronic signature to have legal effect.  *See* Va. Code § 59.1-483(b).[7]  No such agreement existed here.

_____

[7]This chapter applies only to transactions between parties each of which has agreed to conduct transactions by electronic means. Whether the parties agree to conduct a transaction by electronic means is determined from the context and surrounding circumstances, including the parties' conduct . . . .  This subsection may not be varied by agreement.

24

Gitter was instructed to print out the documents and bring them with him to Virginia.  In addition, Stokes informed Gitter that CTSA would review the documents before returning them to Gitter.  *See* Pl.'s Opp'n to CTSA, Ex. G, Ex. 49, GITTER 000653 ("[P]lease ask Dr. Gitter to execute all documents in each package and to overnight them to Dr. Zocco.  We will review the package and return a fully signed package to Dr. Gitter by overnight mail.").  As stated above, Bogard had the same understanding.  CTSA did not intend to be bound by the e-mails.

Accordingly, the undisputed record offers nothing taking this negotiation into the Statute of Frauds, so no contract can be found to exist between Gitter and CTSA**.**

### c.     Equitable Estoppel

 Gitter next argues that CTSA is estopped from asserting a Statute of Frauds defense. "Equitable estoppel will thwart the pleading of the statute of frauds in Virginia." *Nargi v. CaMac Corp.*, 820 F. Supp. 253, 256 (W.D. Va. 1992).  The elements necessary to establish equitable estoppel, "'absent a showing of fraud and deception, [are] a representation, reliance, a change of position, and detriment.'" *Barry v. Donnelly*, 781 F.2d 1040, 1042-43 (4th Cir. 1986) (*quoting T . . . v. T . . .*, 224 S.E.2d 148, 152 (Va. 1976)).  "A person is estopped from denying the consequences of his conduct where that conduct has been such as to induce another to change his position in good faith or *such that a reasonable man would rely upon the representations made*." *Nargi*, 820 F. Supp. at 257.  However, the doctrine of "[u]nclean hands bars a party from receiving equitable relief because of that party's own inequitable conduct." *Food Lion, Inc. v. S.L. Nusbaum Ins. Agency, Inc.*, 202 F.3d 223, 228 (4th Cir. 2000).

---

Va. Code Ann. § 59.1-483(b).

### i.      Elements of Equitable Estoppel

To prevail under equitable estoppel, Gitter must demonstrate that CTSA made a representation, he relied on the representation, he changed his position, and he suffered a detriment.  *Barry*, 781 F.2d at 1042-43.  As to CTSA's representations, Gitter argues that Grembi offered him the position on February 12, 2007, that CTSA made statements that he would be working for CTSA, and that Grembi sent him a congratulatory letter on March 28, 2007.  Gitter maintains that he changed his position in reliance on these representations, and presumably suffered detriment, when he: (1) sold his house in Alabama before March 28, 2007; (2) closed his practice in Alabama; (3) resigned his privileges at MCE and Trinity Medical Center in Alabama on March 29, 2007; (4) divulged trade secrets to CTSA; and, (5) shared nursing protocols, clinical pathways, operative techniques, and orchestrations of specific procedures with RMH.

Gitter points to *Nargi v. CaMac Corp.* to support his equitable estoppel claim.  In *Nargi*, the defendant terminated the plaintiff one and a half years after his employment began.  820 F. Supp. at 255.  Based on the defendant's representations that he would employ the plaintiff for at least four years, the plaintiff sold his house at a loss, moved to another state, and ended business negotiations with another prospective employer.  *Id.*  The United States District Court for the Western District of Virginia barred the defendant from asserting the Statute of Frauds given Nargi's representation that he would not have made such drastic life changes absent assurances he would be employed for four years.  *Id.*  In *Nargi*, however, the plaintiff had begun working for the defendant, and the issue before the court was whether the parties contemplated employment for a definite term such that the defendant was estopped from terminating the plaintiff early.  *Id.*

Even accepting that CTSA and RMH offered Gitter the position after his interview on February 12, 2007, a belief that an employment agreement existed from that time is unreasonable. Gitter's case differs from Nargi's. It is undisputed that unresolved issues remained between the parties until March 28, 2007. Gitter and his attorney continued to raise issues of the non-compete provision, moving expenses, tail insurance, and whether Gitter would be medical director. The fact that Gitter retained an attorney to help with negotiations and refused to sign multiple drafts of the Employment Agreement underscores that no final agreement between the parties had been reached. Therefore, Gitter could not reasonably consider himself an employee of CTSA or RMH while ongoing negotiations ensued, and any steps Gitter took in reliance on the February 12, 2007 "offer" are unreasonable.

However, on March 28, 2007, Gitter received a letter from Grembi stating: "We are very pleased that you have accepted employment with [CTSA] to serve as the primary physician and Medical Director for the cardiac surgery program at [RMH] . . . ." (March 28, 2007 letter.) Also on March 28, 2007, Stokes, Zocco, Gitter, and Bogard participated in an early morning conference call in which the parties agreed there was a complete agreement with no further terms to negotiate. In fact, the parties negotiated no further terms after this phone call. Therefore, Gitter may have believed reasonably that the parties had an agreement on March 28, 2007, and he could have reasonably relied on such a belief.

### ii.    Unclean Hands

The Court, however, cannot grant relief to one with unclean hands. CTSA argues that the Court should not grant Gitter equitable relief because Gitter violated RMH's bylaws when he made multiple misrepresentations on his Credentialing Application, that these representations

constitute fraud in the inducement, and that Gitter failed to fulfill his contractual obligations because of these misrepresentations.  Considering the record, the Court finds that Gitter acted with unclean hands and will not grant him equitable relief.[8]  *See Food Lion, Inc.*, 202 F.3d at 228.

> The Credentialing Application clearly asks:
>
> Whether voluntarily or involuntarily, has any Hospital . . . ever restricted (including probation), reduced, suspended, revoked, surrendered, or refused your participation and/or privileges, invoked probation or taken any disciplinary action against you for any reason other than incomplete medical records?

(Credentialing App., RMH CF0025.)  Gitter responded in the negative.

Gitter failed to report at least four disciplinary actions on the Credentialing Application. Gitter does not dispute that the actions occurred; instead he suggests they need not have been reported.  First, he did not report that MCE suspended him on February 12, 2007, for failure to arrange an on-call physician when he traveled to Virginia to interview.  Second, after MCE rescinded the February 12, 2007 suspension on February 21, 2007, it placed Gitter on probation. Gitter did not report that he remained on this probation until he resigned from MCE on March 29, 2007.  Third, Gitter misstated that he was Active Staff at MCE from "7/99 until 11/03" and "2/05 to present."  (Credentialing App., RMH CF0022.)  In reality, Gitter admits being on Courtesy Staff and Associate Staff for some of that period.  Fourth, Gitter failed to disclose an earlier period of probation after he had departed a previous practice group and his MCE privileges had lapsed without his knowledge, requiring him to reapply.

---

[8] Courts recognize the seriousness of submitting false employment applications. *See, e.g., Wallace v. Dunn Constr. Co.*, 968 F.2d 1174, 1186-87 (11th Cir. 1992) (Godbold, J., dissenting) (reviewing cases where employees were denied relief for discrimination because they submitted false applications).

Gitter clearly knew of these disciplinary actions on March 5, 2007, when he signed the Credentialing Application.[9]  As to the suspension, Gitter claims its February 12 recision negated the need to report.  Some might agree.[10]  However, Gitter's steadfast contention that the "ridiculousness of the situation was transparent" as to the circumstances of the suspension cannot excuse his denial of any probation once the suspension was rescinded.  (Gitter Dep. 115:16-17.) Gitter claims that the demand for on-call coverage was "ludicrous" because MCE knew he would have to ask coverage from his "old ex-partners, who were my current enemies . . . ." (Gitter Dep. 118:2-5, 8.)   Gitter's contention that MCE knew they would refuse to cover, or that the suspension violated their own rules, does not erase the probationary period from February 21 - March 29, 2007.  The undisputed record shows that the answer was incorrect.  Gitter ultimately acknowledged that his response was incorrect as to privileges, as well.   When deposed about the events surrounding the revocation of his privileges, Gitter testified, "So I concede that maybe I should have put yes."  (Gitter Dep. 140:25.)

_____

[9] The Credentialing Application asked Gitter to "Acknowledge that all the statements and responses on [the] application and any supplemental pages [were] true, correct and complete." (Credentialing App., RMH CF0026.)

Gitter dated the pages with questions as to disciplinary actions, and the page with the above acknowledgment "February 5, 2007," which would have predated the February 7, 2007 suspension.  (RMH's Mot., Ex. 1, RMH CF0025-27.)  The next page, seeking information on malpractice history, shows the correct date of March 5, 2007.  Gitter attests that no backdating can be attributed to him because he did not receive the questionnaire until February 27, 2007, so both parties knew it could not have been signed on February 5.

[10] Others might not. *Cf. Jadoo v. De Buono*, 651 N.Y.S.2d 738, 739 (N.Y. App. Div. 1997) (refusing to excuse a physician assistant's withholding information about disciplinary actions on employment applications even though he was fully exonerated).

Gitter nonetheless points to two instances buttressing his assertion that his answers were truthful:  MCE's unreserved recommendation of him[11] and the Iowa Form.  Gitter's argument fails, however, because those documents involve a different, and less specific, level of inquiry.

First, MCE's response to VHP's request for verification of Gitter's staff privileges does not excuse Gitter's failure on his own to report the suspension and probation, or earlier removal of privileges.  The form did not ask for past disciplinary information.  Rather, MCE reported that Gitter stopped having staff privileges at MCE on March 12, 2007.  Gitter could not have any restrictions on his hospital privileges on March 26, 2007 (when MCE filled out the verification form), because at that time, Gitter did not have any hospital privileges.

Also, contrary to Gitter's characterizations, MCE's response to the Hospital Privilege Verification Form submitted by MCE to the Iowa Board of Medical Examiners does not confirm that Gitter did not make material misrepresentations on his Credentialing Application.  Certainly Gitter did not rely on the Iowa Form to answer the Credentialing Application.  Moreover, the Iowa Form asked about "disciplinary action" and "derogatory information," but it did not seek the specific information asked in the Credentialing Application.  (Iowa Form.)  For instance, it fails to ask specifically about "probation" or "invoking probation," or a refusal of "participation" or "privileges." (Credentialing App., RMH CF0025.)  The Iowa Form does not create a genuine issue of material fact.  The uncontested record shows that Gitter does not dispute the questions asked on his own Credentialing Application, that the four events occurred, or that he confirmed his answer should have been different as to at least one issue.  Thus, even taking Gitter's

---

[11] The handwritten mark on the form does not clearly indicate whether the recommendation is with or without reservation.  Neither CTSA nor RMH disputes that it was without reservation.

30

explanations into account, this Court must find that Gitter knowingly omitted material information on the Credentialing Application.  *Cf. Newcom Holdings Pty. Ltd. v. Imbros Corp.*, 369 F. Supp. 2d 700, 714 (E.D. Va. 2005) (finding that the plaintiff had "unclean hands" because it failed to disclose its interest in a patent during a bankruptcy sale, and that this failure was done intentionally to mislead the defendant).

### (a).     **Materiality of Omission**

Gitter's final argument that redress need not commence because Defendants did not rely on any alleged misrepresentations or that they do not rise to a level of materiality, does not survive on this record.  The requirement that Gitter become credentialed to perform surgery in Virginia was a condition precedent to any agreement between the parties.  The Services Agreement states: "The Primary Physician and Second Physician shall meet the requirements of the RMH Bylaws and Medical Staff Bylaws for medical staff membership and clinical privileges, be properly credentialed by RMH and be otherwise qualified and acceptable to RMH."  (Services Agreement 2.)  Gitter's incorrect responses could have provided Defendants with grounds to deny Gitter the credentials needed to practice at RMH.  Janelle Jordan, who coordinates credentialing for RMH, attests that Gitter's responses render his application "incomplete" and "improper." (Jordan Aff. ¶7.)  Jordan states that had such information been disclosed, an investigation would have ensued, and Gitter's credentialing would have been, at the very least, delayed.

In support of immateriality, Gitter highlights that Dr. Crystl Willison, Chair of the RMH committee reviewing applications (including background or credentialing recommendations) could not say absolutely that Gitter's application for credentials would have been denied.

31

Materiality need not rise to such levels of certainty.  Willison attested that Gitter's omission rendered his application "incomplete and improperly submitted" and credentials could not issue upon an incomplete application.  (Willison Aff. ¶ 8.)  Willison also stated that it was "highly improbable" Gitter would have been recommended for privileges, and that she, as Chair of the reviewing committee, "would not have been in favor of" Gitter's candidacy.  (Willison Aff. ¶ 10.)

In short, RMH retained the discretion to disapprove Gitter's employment by CTSA based upon the misrepresentations evaluated above.  *See* Services Agreement 2-3; *cf. Radnay v. Sobol*, 572 N.Y.S.2d 489, 489-90 (N.Y. App. Div. 1991) (finding a two-year suspension of a physician's license proper where he made misstatements and omissions on an application for hospital privileges).  Gitter's misrepresentations constitute a failure to satisfy a condition precedent to any contract between Gitter and RMH and the statements rise to a level of materiality for that reason.

### (b).    Reliance on Representations

Moreover, contrary to Gitter's assertions, the doctrine of unclean hands may apply even if Defendants did not rely on Gitter's representations.  *See College Point Boat Corp. v. United States*, 267 U.S. 12, 15 (1925) ("A party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a legal excuse for nonperformance by him, although he was then ignorant of the fact."); *Cars Unlimited II, Inc. v. Nat'l Motor Co.*, Civil Action No. 2:06cv305, 2007 WL 2344990, at *7 (E.D. Va. Aug. 15, 2007) ("[I]t is a well-established precept of contract law that ignorance of a material breach does not preclude a party from thereafter relying on such breach as justification for its failure to perform.")

Therefore, even if Gitter had a valid argument under equitable estoppel, he cannot prevail because he acted with unclean hands.  Accordingly, viewing the entire record in the light most favorable to Gitter, the Court finds that Gitter's breach of contract claim fails against CTSA.[12]

The Court RECOMMENDS that CTSA's Motion for Summary Judgment as to Count One be GRANTED.

### 2.    Alleged Contract with RMH

The Court next turns to Gitter's breach of contract claim as to RMH.  RMH argues that RMH and Gitter had no contractual relationship because: (1) any such relationship would arise out of the Gitter-CTSA Employment Agreement that was never executed; (2) Gitter fraudulently induced RMH to enter into the Employment Agreement; and, (3) Gitter did not disclose past disciplinary actions and could not become credentialed to perform cardiac surgeries at RMH.  Gitter counters that (1) RMH and Gitter had a contractual relationship because CTSA acted as RMH's agent; (2) RMH is independently bound by its own representations to Gitter; (3) RMH did not rely on any alleged misrepresentation by Gitter; (4) Gitter did not make any misrepresentations; and, (5) even if Gitter made misrepresentations, they were immaterial.

### a.    Contractual Relationship Based on CTSA's Agency

For the reasons discussed above, no contractual relationship exists between CTSA and Gitter.  Therefore, even assuming that CTSA were RMH's agent, Gitter's breach of contract claim against RMH fails under the agency theory.  *Cf. Network Solutions, Inc. v. Hoblad, B.V.*, 82 F. App'x 845, 846 (4th Cir. 2003) (No. 03-1226), *available at* 2003 WL 22989688, at *2,

---

[12]The record does not suggest much detrimental reliance after March 28, 2007, in any event.

(*citing Acordia of Va. Ins. Agency, Inc. v. Genito Glenn, L.P.*, 560 S.E.2d 246, 249-50 (Va. 2002)).

### b.    Direct Contractual Relationship

The Court must also address whether a direct contractual relationship between Gitter and RMH exists.  Gitter maintains that RMH is bound directly by its representations in the Services Agreement and the March 28, 2007 letter from Grembi to Gitter.

### i.    Services Agreement

As to the Services Agreement, it is undisputed that RMH never signed the Services Agreement.  The Services Agreement's performance was premised on the terms of the Employment Agreement.  Because the parties could not perform the Employment Agreement within one year, the Services Agreement also could not be performed within one year.  Therefore, the Services Agreement needed to be in writing to satisfy the Statute of Frauds.  *See Silverman*, 239 S.E.2d at 121-22.

As discussed above, Gitter must present a signed writing that contains the terms of the alleged agreement in clear and distinct terms.  *See Am. Indus. Corp.*, 219 S.E.2d at 676.  Gitter does not direct the Court to any writing that specifically memorializes the agreement he purportedly had with RMH, nor does the Court find any sufficient writing in the record.

Finally, to the extent that Gitter argues that RMH is estopped from asserting the Statute of Frauds, his argument fails for the same reasons that his estoppel argument fails against CTSA. Gitter's misrepresentations and omissions on his Credentialing Application could have precluded

Gitter from receiving the credentials needed to practice at RMH.  Therefore, the Services Agreement created no direct contract between Gitter and RMH.

> ### ii.      March 28, 2007 Congratulatory
> ### Letter from Grembi to Gitter

The Court still must consider Gitter's argument that he has a direct contractual relationship with RMH based on Grembi's March 28, 2007 congratulatory letter.  Grembi congratulated Gitter for accepting employment with CTSA and acknowledged RMH's agreement to provide Gitter's tail insurance, moving expenses, and a bonus opportunity.  Grembi's letter also acknowledges that the parties had not yet signed the agreements and that there were remaining "implementation activities."  (Pl.'s Opp'n to RMH, Ex. E, Ex. 51, GITTER 000993.) However, even if this letter did create a binding contractual relationship between Gitter and RMH, the undisputed record shows that Gitter's misstatements on his Credentialing Application would give RMH basis for terminating the contract.

Viewing the record in the light most favorable to Gitter, the Court finds no direct contract between Gitter and RMH.  The Court RECOMMENDS that RMH's Motion for Summary Judgment as to Count One be GRANTED.

**C.      Count Two (Fraud, Misrepresentation, and Deceit),**
**Count Three (Fraudulent Suppression), and**
**Count Four (Fraudulent Inducement to Enter a Contract)**

The Court next considers Gitter's claims alleging Defendants acted fraudulently.  Gitter could sustain his fraud claims even if he cannot prove that Defendants intended to mislead him. Upon evaluation, however, all of Gitter's fraud claims fail.

1.      **Pleading Requirements Under Rule 9(b)**

As a preliminary matter, the Court weighs Defendants' argument that Gitter failed to

plead Counts Two, Three, and Four with particularity as required by Rule 9(b).  Rule 9(b) states:

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting

fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be

alleged generally."  Fed. R. Civ. P. 9(b).  Rule 9(b) has four purposes:

> First, the rule ensures that the defendant has sufficient information to formulate a
> defense by putting it on notice of the conduct complained of . . . .  Second, Rule
> 9(b) exists to protect defendants from frivolous suits.  A third reason for the rule
> is to eliminate fraud actions in which all the facts are learned after discovery.
> Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*United States v. Maxwell*, 189 F. Supp. 2d 395, 399 (E.D. Va. 2002) (*quoting Harrison v.*

*Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)).  A plaintiff satisfies Rule

9(b) when he or she "alleges the 'time, place, and content of the false misrepresentation, the fact

misrepresented and what was gained or given up as a consequence of the fraud.'" *Sweeney Co. of*

*Md. v. Eng'rs-Constructors, Inc.*, 109 F.R.D. 358, 360 (E.D. Va. 1986) (citation omitted); *see*

*also Harrison*, 176 F.3d at 784 (stating that dismissal under Rule 9(b) is not proper "if the court

is satisfied (1) that the defendant has been made aware of the particular circumstances for which

she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery

evidence of those facts.").  When jurisdiction stems from diversity of citizenship, the law of the

state in which the district court sits governs the court's determination of whether the plaintiff has

satisfied Rule 9(b).  5A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure

§ 1297, at 56-57 (3d ed. 2004).  "A district court may enter summary judgment dismissing a

complaint alleging fraud if the complaint fails to satisfy the requirements of Rule 9(b)." *Murr Plumbing, Inc. v. Scherer Bros. Fin. Servs. Co.*, 48 F.3d 1066, 1070 (8th Cir. 1995).

After considering the record, the Court finds that Plaintiff has sufficiently pled his fraud claims under Rule 9(b).  While the Second Amended Complaint vastly simplified Gitter's claims, it purported to "incorporate[] all allegations and claims made in the previous complaints." (July 10, 2007 2d Am. Compl. n.1.)  Defendants and the Court had ample notice of the details underlying Gitter's fraud allegations.  *See Harrison*, 176 F.3d at 784.  These allegations sufficiently placed Defendants on notice of Gitter's claims against them, and otherwise meet the Rule 9 requirements.  Therefore, the Court will consider whether summary judgment is proper as to Gitter's fraud claims.

### 2.     Count Two:  Fraud, Misrepresentation, and Deceit

Under Alabama law, "[f]raud by one, accompanied with the damage to the party defrauded, in all cases gives a right of action."  Ala. Code § 6-5-100.  The elements of fraud are: "(1) a false representation (2) of a material existing fact (3) reasonably relied upon by the plaintiff (4) who suffered damage as a proximate consequence of the misrepresentation."  *Saia Food Distribs. & Club, Inc. v. SecurityLink from Ameritech, Inc.*, 902 So. 2d 46, 56 (Ala. 2004) (quotation omitted).  An action for promissory fraud is one "based upon a promise to act or not to act in the future."  *Id.* at 56-57 (quotation omitted).  To prove promissory fraud, "two additional elements must be satisfied: (5) proof that at the time of the misrepresentation, the defendant had the intention not to perform the act promised, and (6) proof that the defendant had intent to deceive."  *Id.* at 57 (quotation omitted).  "[F]ailure to perform a promised act is not in itself evidence of intent to deceive at the time a promise is made."  *Padgett v. Hughes*, 535 So.

2d 140, 142 (Ala. 1988).  If a plaintiff seeks punitive damages, he or she must prove a fraud

claim by clear and convincing evidence.  *See* Ala. Code § 6-11-20.

### a.  Promissory Fraud Claim Against CTSA

At oral argument, Gitter's attorney stated that Gitter's promissory fraud claim against

CTSA stems from the allegation that Defendants never intended to hire Gitter.  To defeat a

motion for summary judgment, Gitter need present only a "scintilla" of evidence that Defendants

did not intend to hire him.  *See Padgett*, 535 So. 2d at 142 (finding that a defendant's testimony

constituted a "scintilla" of evidence whereby a jury should decide the issue of intent).  Gitter fails

to make this showing because the record lacks any evidence of intent to defraud.  It is

Defendants' eleventh-hour change, not an ongoing intent to defraud, that drives most of Gitter's

claim.  The record is replete with information about two months of resource-intensive

negotiations, none of which suggests a lack of intent to hire.  *See* Zocco Dep. 154:1-4 ("Our

intention was always to hire Ricky Gitter, have him come to Virginia, run this program, be a

member of our group.").  The extensive record belies Gitter's contention otherwise, and his

position alone cannot create an issue of fact for the jury.  Therefore, Gitter's promissory fraud

claim on this basis fails because no evidence exists that CTSA never intended to hire him.[13]

---

[13] Although it is not clear Gitter raises these arguments in this context, CTSA addressed two additional grounds on which Gitter's promissory fraud claim could rest: (1) the allegation that Defendants did not intend to sign the Employment Agreement; and, (2) the allegation that CTSA did not intend to hire Chang.  The Court finds that even under those theories, the promissory fraud claim fails.  The fact that CTSA did not sign the Employment Agreement does not prove that CTSA never intended to sign the Employment Agreement.  *See Padgett*, 535 So. 2d at 142.  Gitter's conclusory assertions that Zocco never intended to sign the Employment Agreement, does not raise a jury question because nothing on the record suggests that Zocco acted in that fashion.  Rather, the record reflects that Zocco intended to sign the finalized agreement, but did not sign it because RMH decided not to hire Gitter.  *See* Zocco Dep. 39:20-21; Lange Dep. 25:22-23. As to CTSA's intent to hire Chang, Gitter concedes that hiring Chang

b.      **Promissory Fraud Claim Against RMH**

In his promissory fraud claim against RMH, Gitter maintains that if CTSA committed

fraud against Gitter, then RMH also is liable for fraud because CTSA was RMH's agent.  Gitter

also argues RMH is liable for fraud because it directly contracted with Gitter through the

Services Agreement, and because it intentionally misled Gitter when Grembi represented, in his

March 28, 2007 letter to Gitter, that RMH would pay Gitter's tail insurance and moving

expenses, and that Gitter would have a bonus opportunity.

First, even assuming that CTSA were RMH's agent, Gitter's claim fails because his claim

against CTSA for promissory fraud fails.  Second, in order to prevail, Gitter must prove that

RMH never intended to sign the Services Agreement.  *See Saia Food Distribs. & Club, Inc.*, 902

So. 2d at 57.  As the record shows with CTSA, no evidence demonstrates that Grembi or anyone

else from RMH did not intend to sign the Services Agreement.  Indeed, RMH's selection

committee and its interview process suggest otherwise.  The extensive record of negotiations

countermand any finding that RMH never intended to sign the Services Agreement.  RMH asked

CTSA to help recruit candidates, and RMH signed the CTSA/RMH Agreement on September 8,

2006, strongly suggesting that RMH intended to sign the Services Agreement.  While Gitter

contends fraudulent intent, he does not raise a jury question because the record as a whole

produces no facts suggesting that RMH never intended to sign the Services Agreement.

Accordingly, Gitter's promissory fraud claim against RMH fails.

---

was not "pivotal to the deal."  (Gitter Dep.104: 20-105:2.)  Gitter's promissory fraud claim
against CTSA fails on these grounds as well.

### c.       **Actual Fraud**

Gitter's allegations are not limited to claims of promissory fraud.  He also alleges that Defendants committed actual fraud by misrepresenting that the parties had an agreement to employ Gitter on February 12, 2007, and that the Services Agreement was in place on March 26, 2007.  Under Alabama law, representations sufficient to sustain a fraud claim can be "made willfully to deceive, or recklessly without knowledge."  Ala. Code § 6-5-101; *see Smith v. Reynolds Metals Co.*, 497 So. 2d 93, 95 (Ala. 1986) ("An innocent misrepresentation is as much a legal fraud as an intended misrepresentation and the good faith of a party in making what proves to be a material misrepresentation is immaterial . . . if the other party acted on the misrepresentation to his detriment.").  Therefore, if Defendants made these statements recklessly or intentionally, and Gitter reasonably relied on the statements, Gitter can sustain his actual fraud claim.

### i.       **Actual Fraud Claim Against CTSA**

Zocco concedes that Gitter was offered and accepted the position in general terms on February 12, 2007.  Negotiations ensued.  The record shows that any statement during these negotiations indicated performance in the future, and the record cannot support a finding of lack of intent to do so.  Gitter fails on what amounts to a claim of promissory fraud.  Any statement by Zocco that Gitter's signature was the "missing piece in the puzzle" does not suggest otherwise. (Gitter Dep. 91:13-24.)  The record, and the reasonable inferences therefrom, clearly show that the contract was not complete.

However, the parties do not dispute that on March 28, 2008, Zocco told Gitter they would either sign the agreement that night, or abandon the agreement.  The March 28, 2007 letter also is

40

not in dispute. Therefore, even if Zocco did not intend to communicate that the parties had an agreement, sufficient representations might have been made to support a claim of actual fraud if Gitter reasonably relied on the statements.  Gitter cannot claim reasonable reliance.

Gitter maintains that he relied on these representations when he closed his medical practice in Birmingham, stopped seeing patients in early March 2007, sold his house, took steps to become credentialed and privileged in Virginia, resigned from MCE, disclosed trade secrets and marketing strategies to CTSA and Zocco, shared his nursing protocols with RMH, and agreed to teach continuing education classes for RMH.

Under Alabama law, a plaintiff cannot close "'his eyes to avoid the discovery of the truth.'" *Withers v. Mobile Gas Serv. Corp.*, 567 So. 2d 253, 255 (Ala. 1990) (citation omitted). Reliance was not reasonable while key terms of employment remained in play.  *See Doll v. Grand Union* Co., 925 F.2d 1363, 1373 (11th Cir. 1991) (applying Georgia law to find reliance unreasonable during ongoing negotiations where statements were expressly conditional in nature); *Beiersdoerfer v. Hilb, Rogal & Hamilton Co.*, 953 So. 2d 1196, 1206 (Ala. 2006) (asserting that negotiations for a contract modification are not binding because negotiations alone do not prove mutual assent).

First, as found above, Gitter cannot claim reasonable reliance pre-March 28, 2007 during ongoing negotiations and when he improperly submitted his Credentialing Application.  Second, the Court must consider whether Gitter could believe a contract existed on March 28, 2007.  To evaluate this, the Court must assess whether Gitter could reasonably have believed that the parties had an agreement knowing that he made material misrepresentations or omissions on a

41

Credentialing Application that Defendants had not yet reviewed, where such misrepresentations or omissions would give Defendants cause to terminate negotiations and/or any agreement.

The Court cannot find that the record establishes that Gitter reasonably could have held such a belief.  The Court already has noted that, even considering his explanations, Gitter acted with unclean hands when he omitted material information on his Credentialing Application.  *See Armani v. Maxim Healthcare Servs., Inc.*, 53 F. Supp. 2d 1120, 1127-28 (D. Colo. 1999).  Gitter knew that Defendants could rescind any agreement if he failed to be credentialed.  Gitter cannot argue that CTSA surprised him or otherwise precluded him from making reasonable inquiry because he was the source of the disqualifying misstatements made to CTSA.  *Compare Pettinelli v. Danzig*, 722 F.2d 706, 710 (11th Cir. 1984) (reliance unreasonable because adversarial relationship put parties on notice not to rely), *with Reynolds Metals Co.*, 497 So. 2d at 95 (reliance reasonable on innocent misrepresentation about summer program requirements).  Simply put, even viewing the record most favorably for Gitter, Gitter knew on March 28, 2007, that he had submitted an improper Credentialing Application, and he cannot claim reasonable reliance.  The Court RECOMMENDS that CTSA's Motion for Summary Judgment as to Count Two be GRANTED.

## ii.      **Actual Fraud Claim Against RMH**

Gitter bases his actual fraud claims on the February 12, 2007 and March 28, 2007 communications sent by Grembi.  These misstatements affirming the existence of an employment agreement, whether intentionally or recklessly made, could support Gitter's actual fraud claim if he reasonably relied on them.

42

For the same reasons discussed above regarding his Credentialing Application, the Court finds that Gitter acted unreasonably when he relied on RMH's representations.  The Court RECOMMENDS that RMH's Motion for Summary Judgment as to Count Two be GRANTED.

### 3.      Count Three:  Fraudulent Suppression

"Suppression of a material fact which the party is under an obligation to communicate constitutes fraud.  The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case."  Ala. Code § 6-5-102.  The elements of fraudulent suppression are: "(1) A duty (on the part of the defendant) to disclose material facts, (2) which are concealed or not disclosed by the defendant, (3) and which induced the plaintiff to act (4) to his injury, (5) resulting in actual damage to the plaintiff."  *Exxon Mobil Corp. v. Ala. Dep't of Conservation & Natural Res.*, No. 1031167, 2007 WL 3224585, at *18 (Ala. Nov. 1, 2007).  Gitter contends that Defendants suppressed their lack of intent to contract with him, the lack of an in-place services agreement, and their decision not to hire Chang.  Gitter presents no evidence indicating that Defendants had a duty to disclose any *material* facts to him.  First, no evidence suggests that Defendants did not intend to hire Gitter until March 29, 2007, when they did not do so.  Second, the lack of an in-place services agreement is immaterial to an employment contract whose terms also have not been finalized.  Finally, neither party disputes that hiring Chang was not a material term of the contract.  Indeed, even assuming that Defendants did have a duty to disclose material facts, Gitter presents no evidence that Defendants *intentionally* withheld information from him.  *Cf. id.* (rejecting a plaintiff's claim of fraudulent suppression where the evidence showed that the defendant responded to all requests for information).  CTSA negotiated with Gitter and responded each time he raised issues or

43

concerns.  Accordingly, the Court RECOMMENDS that Defendants' motion for summary

judgment be GRANTED as to Count Three.

### 4.     Count Four:  Fraudulent Inducement to Enter a Contract

"Fraud in the inducement consists of one party's misrepresenting a material fact

*concerning the subject matter of the underlying transaction* and the other party's relying on the

misrepresentation to his, her, or its detriment in executing a document or taking a course of

action."  *Johnson Mobile Homes of Ala. v. Hathcock*, 855 So. 2d 1064, 1067 (Ala. 2003) (citation

omitted); *see also Ramsay Health Care, Inc. v. Follmer*, 560 So. 2d 746, 749 (Ala. 1990)

(applying the elements of a fraud claim to a fraudulent inducement claim: "(1) misrepresentation

of a material fact; (2) made willfully to deceive, or recklessly without knowledge; (3) which was

justifiably relied upon by the plaintiff under the circumstances; and (4) which caused damage as a

proximate consequence").

For the reasons discussed above, even viewing the record most favorably to Gitter, no

facts support his conclusory allegation that CTSA never intended to hire him.  Gitter also

presents no facts to support his allegation that RMH never intended to sign the Services

Agreement.  Any reliance becomes unreasonable based on Gitter's treatment of his Credentialing

Application.  Accordingly, the Court RECOMMENDS that Defendants' motions for summary

judgment be GRANTED as to Count Four.

### D.     Count Five:  Conspiracy

Finally, the Court finds that Gitter fails to allege sufficient facts to support his claim that

CTSA and RMH conspired and combined against him.  In Alabama, "civil conspiracy is a

combination of two or more persons to do: (a) something that is unlawful; [or,] (b) something

that is lawful by unlawful means." *Purcell Co. v. Spriggs Enters., Inc.*, 431 So. 2d 515, 522 (Ala. 1983).  When a plaintiff fails to prove the underlying wrongful act of the conspiracy, the conspiracy claim fails.  *See id.* ("Where civil liability for a conspiracy is sought to be enforced, the conspiracy itself furnishes no cause of action.  The gist of the action is not the conspiracy alleged but the wrong committed.") (citation omitted).

Viewing the record in his favor, no material dispute of fact remains preventing the Court from ruling against Gitter as a matter of law as to his underlying fraud claims.  Similarly, Gitter offers no material dispute to facts that show, as a matter of law, that no conspiracy existed.  *See id.*; *see also Barber v. Stephenson*, 69 So. 2d 251, 255-56 (Ala. 1954) (stating that there "need be only a scintilla of evidence" of a civil conspiracy to submit the issue to a jury).  Gitter repeatedly injected uncertainty as to terms.  At best, Gitter's characterization of the record shows a lack of communication between CTSA and RMH, resulting in inconsistent messages to Gitter on March 28, 2007.  The inconsistent nature of the messages demonstrates a failure to work together, not a coordinated conspiracy.  Therefore, the Court RECOMMENDS that Defendants' motions for summary judgment as to Count Five be GRANTED.

## V.  Conclusion

For the foregoing reasons, the Court RECOMMENDS that the Defendants' motions for summary judgment be GRANTED.  (Docket Nos. 41, 46.)  The Court RECOMMENDS that the Second Amended Complaint be DISMISSED.  (Docket No. 26, Ex. 19.)

The parties are ADVISED that they may file specific written objections to the Report and Recommendation within ten (10) days of the date of entry hereof.  Each objection should be labeled with the corresponding heading from the Report and Recommendation, should be

45

numbered, and should identify with specificity the legal or factual deficiencies of the Magistrate

Judge's findings.  Failure to file specific objections to the Report and Recommendation in a

timely manner may result in the entry of an Order dismissing the Complaint.  *See* Fed. R. Civ. P.

72(b).  It may also preclude further review or appeal from such judgment.  *See Wright v. Collins*,

766 F.2d 841 (4th Cir. 1985).

 The Clerk is directed to send a copy of the Report and Recommendation to all counsel of

record and to the Honorable Richard L. Williams.

/s/
_____
M. Hannah Lauck
United States Magistrate Judge

Richmond, Virginia
Date:  <u>July 15, 2008</u>